The Constitution requires a case or controversy to get you through the courthouse doors. That requirement is especially essential when you're trying to get some kind of equitable relief, such as an injunction or declaratory judgment, from a federal court telling a state officer that that state officer cannot enforce a state law. CDIA cannot meet the case or controversy requirement here for two main reasons. The first is that the individual who they seek to enjoin has shown no intent to enforce the statute against them. So they don't have an injury, in fact. And the second one, which is related, is that the relief that they request will not address their injuries. So I'd like to begin by addressing the questions that the Court posed in the request for supplemental briefing. The first and fourth questions address the potential harms that CDIA is—or the potential harms that the Court mentioned, one of which is this harm of enforcement and one of which is the harm that CDIA has said for the most part in their amended complaint, which is the fact that they're going to have to change how they operate, which they said would potentially take two years, potentially use some resources. So that particular complaint or that particular harm is the injury, in fact, that we should be considering for the case for a few reasons. First of all, every plaintiff can say that the potential for injury or potential for harm is the enforcement of the statute against them, right? So that's not a particularized injury here. What makes CDIA unique is that it claims that it has this extra expense because it's going to have to change the way that it operates. The second, I guess, part of that, of course, is that we don't agree that CDIA can actually say that there was an injury, in fact, here. First of all, you have the facts, right? So this statute came out in May 2019. The CDIA went to court to enjoin it in September 2019, which might not seem like a lot of time, but in Texas, when you look at how laws are working, that's actually plenty of time to bring a case that they were going to. The Attorney General made no indication that he was interested in going after CDIA or CDIA's members. There was no press release saying, you know, here is what we're going to do next. They've alleged only two interactions between the Attorney General and CDIA's members. First of all, the three main credit reporting agencies entered into a settlement where Texas just kind of joined onto the settlement, and while that did concern credit, it was actually about incorrect reporting. So instead of reporting that something had been paid off by insurance, it was still being used to lower someone's credit. Here, this particular law is very different. This is more of a policy decision, as in, you know, a lot of times people go to the emergency room, and they're getting a surgery, and they don't realize that an anesthesiologist is going to come in who's out of network, and that their charge for the surgery is going to be a lot more than they think. And so that's a completely different issue than the settlement that all of the other Attorneys General's brought. And then the second interaction, of course, was the data breach. But to get back to the questions in the supplemental briefing, the second and the third one addressed kind of redressability, and I think that after a whole woman's health, it's fairly clear that you have to have the person who is going to be responsible for the harm that you're alleging. And so while the Attorney General does have the authority under 2011 to bring an injunction or to sue for particular violations, there's a whole other section, 20.06 to 20.09, that's all about consumer suits, which makes sense because the consumer is the one who's going to be looking at their credit report, trying to figure out what happened, and then trying to work with the credit reporting agency. And then also, as we mentioned in the brief, under 20.12, if there's a deceptive conduct, kind of like the conduct that I talked about before with the anesthesiologist, that's also a way that you can bring a claim. And under the Deceptive Trades Practices Act, you're also going to have the Consumer Protection Department, as well as local and county attorneys. Well, you're not saying the Attorney General couldn't bring an action. You're just saying the Attorney General is not the only one who can bring it. Exactly. The Attorney General is not the only one who can bring the action. And so one of the arguments that CDIA makes is that, well, you don't have to have a perfect solution, right? You can just redress some of the injury. But the cases that they're citing first are about a little bit more of, I think, what KP was about or what Air Evac was about, where you're finding a person who is involved in as much of the process as you possibly can. It's not about just enjoining one person while a whole bunch of other people can also bring the suit, right? That's exactly what was rejected in Whole Woman's Health, where just because you could find one person, that didn't mean that you had to ignore the fact that all these other people can bring that particular claim. So a question, just a follow-up about Whole Woman's Health. So the Supreme Court said that an official who, quote, may or must, may or must enforce a law, cannot assert immunity at the motion-to-dismiss stage. And I wonder why that doesn't eliminate immunity here, since the Attorney General may enforce the statute against agencies. Well, so I think that was one of the issues that they were looking at when it came to whether or not there was an injury in fact or whether that injury would be impending or imminent. The other thing that they noted that Justice Thomas criticized in his opinion was that they said that doctors and their businesses are already being affected by the law. So they were already, you know, closing their businesses. They were already telling potential clients that they couldn't help them with abortions. Whereas here, there's just no evidence of that. Where we really are is in the – and one of the other things that I want to mention is that while CDIA says this is the motion-to-dismiss stage, all of these cases are at the motion-to-dismiss stage. So whatever the standard is that they're saying is the standard that we should apply. But in any event, you know, this is more like the city of Austin case, for example, where you just have – you know, you don't have any signs of enforcement. You don't have any signs that there's some kind of particularized harm going on now. This is not a First Amendment case. And, you know, the court could step in and tell the state not to do something that it's not already doing. But then that's just giving you an end run around Article III. And you're really just encouraging companies to kind of flip through the statute book, find a law that they think might affect them, and try to bring a claim, which is – So I'm still trying to figure out how Clapper fits into this and how it might ultimately dictate the court's treatment. Has the Attorney General taken any steps or made any kind of pronouncements regarding – that leaves open the possibility unless there's something in the record that suggests otherwise? As I understand it, we don't have any clarity on what the intention or what the policy of the Attorney General is, do we? Right. We don't. So there hasn't been anything – So I think Clapper would be a slightly different thing because, you know, there was some indication of enforcement but just against some other party. But we would say, as in Clapper, that, you know, if the injury that CDIA is claiming its members are suffering is this whole kind of operational change, that's about as close to a self-inflicted injury as you can get because there's just been no indication since 2019 that the Attorney General is interested in these kinds of – in enforcing this particular statute. And then you could also look back to 2015, back to when you had the group of attorneys general, and say, well, even since back then, there hasn't been kind of a movement in this direction. And that's also what happened with the city of Austin, right, is where, you know, there were prior suits, you know, about preemption of state law or, you know, city ordinances, but it wasn't about this particular subject and so it wasn't an issue that you had some imminent threat to enforcement. Another thing that I just want to mention, because I think it is a little bit hard to swallow sometimes, that a company is just going to have to wait. First of all, you know, no company has the right to pre-enforcement review. And they also have solutions. Just as in Whole Woman's Health, you can go to a state court and try your luck there. You can also, you know, try to make some kind of inquiry or reach out or something. I think a good example of this, for some extent, is the Walmart versus USDOJ case. And in that case, Walmart is being criticized on both sides for the use of or how it's dealing with opioid use with its pharmaceutical companies. And it's engaging in a kind of long settlement with the Department of Justice. And while there the court said, you know, you don't actually have a position from the Department of Justice at this point, you can see that that is what you can see. Well, one, even though Walmart had a lot at stake, that still didn't get them into pre-enforcement review. But also you can see that this is something that a company might do, right, is just try to get a position out of this. Another thing I think that, you know, as we mentioned, is you also have this Deceptive Trades Practices Act point going on. So, you know, even if the Attorney General could be enjoined from enforcing under 20.05A5, still under 20.12, you have this other, you know, you're encouraging consumers and Consumer Protection Bureau Division to bring this same kind of claim. I think the last, I think the last question was kind of about ripeness, but really that's a lot of an overlap here. So if there's no case or controversy to look at, then it's not ripe. And I do want to mention that in our letter, and I apologize because we should have, if we'd run into it earlier, we mentioned this No Surprises Act. But we don't think that you need to go back and look at the facts or anything to figure out kind of standing. We think that our standing argument is fine, you know, without even that. Like, we were interested in what the response would be, but we don't think that it's necessary for you to look into that or apply that to any analysis to find that the district court erred here. Are there any other questions? Thank you, Counsel. Good morning, Your Honors, and may it please the Court. My name is Jennifer Sarvati, and I'm here on behalf of the Consumer Data Industry Association. The Supreme Court in Abbott Labs said it best. The dilemma posed by government coercion, putting the challenger to the choice between abandoning his rights or risking prosecution, is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate. And CDIA members face this very dilemma with respect to this Texas law, make substantial changes to their day-to-day operations with respect to the millions of reports that they provide each year, or face the risk of enforcement. And that enforcement action comes coupled not only with injunctive relief, but substantial retroactive penalties for violations. CDIA has demonstrated that it has standing in this case. The businesses must now take immediate action or face an active action by the Attorney General. Don't they also face actions from private litigation? They do. How does the relief we offer you here, if we were to agree with you, alleviate the grievance? So as the Supreme Court has made clear in Steffel, a favorable declaratory judgment has value in and of itself because it prevents the harm from the actor being sought to and be enjoined. So in this case, we would be able to enjoin action by the Attorney General under 20.05. And the Supreme Court has made clear that this cutting down of the deterrent effect of a nonconstitutional statute is in and of itself enough to establish standing. We are not asking this court to enjoin consumer actions, nor could we. But the truth of the matter is that if the district court finds this law preempted and this court in an appeal ultimately affirms that decision, it would have a binding precedential effect on that legal question, whether or not the law is in fact preempted. Let me ask the same question with regard to Clapper. How do you get around Clapper? Respectfully, I don't think Clapper is relevant to the facts of this case. In Clapper, what we had were attorneys or other persons who had some relationship with the targets of the law, and they wanted to bring a claim to cease the monitoring of telephone calls in case their calls happened to be swept up within the scope of that activity. In this case, we have a law that is targeted exclusively at CDIA members, and it is enforceable by this attorney general as to those members. And I think it is important, and with all due respect to opposing counsel, to suggest that they have done nothing to enforce this law is irrelevant for the purpose of this analysis. Number one, the law was enacted in May of 2019. In July of 2019, we communicated with the attorney general's office and provided a draft injunction. The parties then proceeded forward with the litigation, and at a status conference with the court, set a briefing schedule, not on motion to dismiss, but for summary judgment on the ultimate legal question to be decided. We had COVID, and delays ensued in the course of the litigation. Ultimately, CDIA was granted leave to file an amended complaint, which is the operative complaint for the case here. But the attorney general's office has done more than simply defend this case. In April of 2021, the attorney general's office issued an advisory opinion on this law and explained the scope and effect of the law and identified the type of information that is subject to it. So to say that we've done no press release and we haven't filed the case, well, they didn't file a case because we filed first. They have taken action. They've defined the scope of the law. They have an intent to proceed. I think it's also important that the City of Austin case be addressed because in the City of Austin case, what this court said, what the Fifth Circuit said, is that we need a scintilla of enforcement. And where do we find that scintilla? Well, we have more than that here. With respect to the counsel, the 2015 case brought by the attorney general challenged practices of the same CDIA members who are subject to this law with respect to their activities in credit reporting and specifically challenged the reporting of other kinds of medical account information. If you review the complaint in the record on page 446, paragraphs 23 through 25, we explain the nature of that 2015 enforcement action and how it covered the medical collection account information at issue there. Also in the record on page 465, there is an entire page of how the state is going to regulate that type of medical collection account information. So this same attorney general filed an action against these same defendants with respect to almost the same but slightly different medical collection account information. Now, the attorney general will tell you, well, we didn't file that under 20.11 or 20.05. We filed it under the Deceptive Trade Practices Act. Well, under 20.12, which is the state's consumer reporting law, it says that a violation of 20.05 is a violation of the Deceptive Trade Practices Act, and it's certainly a more appealable press release to say I'm trying to curtail deceptive trade practices by the consumer reporting agencies instead of saying I'm trying to correct inaccuracies. Do your members, would they remain liable to consumers even if you received all the declarative and injunctive relief you're requesting against the attorney general? As a practical matter, I'm sure the members of the association would defend the case on preemption grounds, and hopefully a court would find a ruling by the district court at least persuasive on the legal question of whether, in fact, it is preempted. But the law is clear that you don't have to solve all of the problems that a petitioner might have with respect to a law. In fact, in the Sanchez case, the Fifth Circuit said you have to show that the favorable ruling could potentially lessen the injury. It need not definitively demonstrate that a victory would completely remedy the harm. This case falls squarely within that case, in the Steffel case, in other cases that we've cited, where if this court, if the district court, has the opportunity to enter an order precluding this Texas attorney general from suing these same companies again under Texas law with respect to their credit reporting activities, to be honest, that's the 900-pound gorilla in the room. And that is the relief that our clients are requesting. They are not requesting a bar as against individual consumers. Moving on to the further discussion by counsel with respect to the No Surprises Act, I would simply like to say that that's a matter that's not been briefed before the district court, nor was it properly raised as an issue before this court, and we would suggest that the court not consider this late-raised argument at this time. CDIA has alleged what is required under Article III, and it is no different for this type of declaratory judgment action as for another federal action. CDIA has alleged injury in fact that is fairly traceable to the conduct of this attorney general and is likely to be addressed by a favorable decision of this court. I think this case boils down to a question of the threat of enforcement and what is enough. Let me ask you this, going back to my earlier question. Suppose we conclude that your members would still be liable to consumers even if you prevail here. Suppose we conclude that, and I wonder if that would eliminate the compliance cost injury that you focus on, since your members would still need to comply with the statute to stave off any consumer liability, and that then leads me to wonder whether that poses a redressability problem. Well, Your Honor, the question as to whether the matter could be a bar as against consumers is not technically before the court, and so there would be no binding precedents with respect to that. But let's be really honest. Well, consumer reporting agencies have no intention to violate the law. This is a practice that has been going on for a long time in full compliance with the FCRA, which has a number of provisions that say when and how CRAs may report this type of information. So it's wholly permissible under federal law. This is not a new activity. If there's a violation of the FCRA requirements with respect to consumer accounts, consumers still have their right of action under the FCRA and to a limited extent under state law. But to answer your question, I don't think that is a question presently before the court, nor given STFL and the Fifth Circuit authority on redressability, the fact that it does not have to wipe the slate completely clean. We have established enough for CDIA to have a day in court and get beyond the motion to dismiss states and have their case heard. At this point, I think we've discussed ripeness. It was not addressed by the prior individual, but just to say that the ripeness doctrine is not intended to bar claims that are justiciable and timely and presently available and fully at issue in order to provide relief.  or no factual development of facts in order to find that this is justiciable and to answer the pure legal question that is presented to the court. Finally, I would say that the Ex Parte Young requirements require a simple and straightforward inquiry of the three-part test, which this court has adopted, naming the individual in their official capacity, alleging an ongoing violation of federal law, and seeking relief that is prospective. Again, the Texas Attorney General, if it chooses to enforce this statute as against our clients, the moment that this case is over may seek retroactive penalties, going back to the date of enforcement in 2019. That's $2,000 per occurrence per day. It's an astronomical number. And CDIA had the right, on behalf of its members, to bring this case forward and have this legal question of applicability and scope decided by a federal court, just like in the MedImmune case. We need not force ourselves to be out of compliance, to wait for the government to take an action. It is the effect of the coercive nature of the penalty that gives CDIA members the right to come forward and get relief in this court. Because to suggest that we want, as an outcome of this case, if the state were to win, that state courts across Texas are going to be the ones deciding whether federal law preempts state law. That's not the right outcome. CDIA has alleged standing, they've alleged a right claim, and we respectfully request that this court enter in order. I don't want to talk your ear off. I would love to answer more questions, but if you have no additional questions for me, I think I've concluded my time. Thank you, Counsel. Thank you. Rebuttal. Just a few points, Your Honor. First of all, yes, it looks like I misspoke. I wasn't aware of the April thing, and I don't see it in the briefings, but to the extent that that matters, I think we're more in the realm of whole woman's health again, right, where we knew that Texas and we know that states have intentions toward abortion more generally, but you still need to show that you're going to be able to redress the relief that you are seeking. I also think, I mean, we would say that you shouldn't consider it at all because it hasn't been briefed, but in any event, you still need to show redressability. And I also think that to the extent that this press release did not seem to be another indication that CDIA's members were going to have to face enforcement of 20.05, then it should also count for that as well. Well, nothing prevents the Attorney General from just stating I'm not going to prosecute anybody under this statute. Right. I mean, he's, you know, and certainly he wouldn't be speculating about whether or not somebody could be prosecuted under this statute. Right. And, you know, it's not as if government isn't allowed to announce a law that they're passing, and it's not as if we have to say we're never going to enforce the law to avoid pre-enforcement review. Those are not required. I think also with regard to the Sanchez case and redressability, that case was a pretty complicated case about basically a whole bunch of child custody issues with this one particular family. But there, the redressability issue is what I discussed before, where they basically enjoined the person who they thought could find the children or had the most authority over the children. And so it wasn't just, you know, it's okay if we enjoin one person who can stop 30% of the claims or something. It was really, you know, this is our best in terms of how we can try to get relief. The last point I just want to say is, you know, while pre-enforcement review and Ex Parte Young are federal solutions, for the most part we can rely on state courts to enforce the federal constitution. And I don't think that kind of operating from that premise that we couldn't go to state court or a party couldn't go to state court and bring similar claims is a reason that everyone should be able to jump into federal court. I don't have any more questions. Thank you, counsel. The court will take this matter under advisement, and we are in recess until 9 o'clock tomorrow morning.